# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| SHARON CLARK, | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: 3:11-cv-0953 |
| v. | ) | JUDGE WISEMAN |
| | ) | MAGISTRATE JUDGE BROWN |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| Defendant. | ) | |

To:     The Honorable Thomas A. Wiseman, Jr., Senior District Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c) to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Sharon Clark's application for Disability Insurance Benefits (DIB), as provided under Title II of the Social Security Act (the "Act"), as amended. Currently pending before the Magistrate Judge are Plaintiff's Motion for Judgment on the Administrative Record and Defendant's Response. (Docket Entries 16, 17, 20). The Magistrate Judge has also reviewed the administrative record (hereinafter "Tr."). (Docket Entry 12). For the reasons set forth below, the Magistrate Judge **RECOMMENDS** the Plaintiff's Motion be **DENIED** and this action be **DISMISSED**.

## I.  INTRODUCTION

Plaintiff filed for DIB on April 21, 2009, with an alleged onset date of April 7, 2009. (Tr. 104-05). Her claims were denied initially on July 29, 2009 and on reconsideration on January 6, 2010. (Tr. 66-69, 74-76). She requested a hearing before the ALJ, which was held on May 18, 2011 before ALJ Brian Dougherty. (Tr. 20-50, 77). On June 28, 2011, ALJ Dougherty issued an

1

unfavorable decision.  (Tr. 7-16).  Plaintiff requested review by the Appeals Council on July 6, 2011, and The Appeals Council denied her request on September 15, 2011.  (Tr. 1-5, 100-03).

In his decision, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2012.

2.    The claimant has not engaged in substantial gainful activity since April 7, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.    The claimant has a severe impairment: major depression (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels and is mentally able to understand, remember, and carry out simple and detailed job instructions, can maintain concentration to keep up with a production-rate pace, and can respond appropriately to changes in the usual work setting.

6.    The claimant is capable of performing past relevant work, including the jobs as a teacher's aide, a sales clerk, and a hair stylist (20 CFR 404.1565).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from April 7, 2009, through the date of this decision (20 CFR 404.1520(f)).

This action was timely filed on October 5, 2011.  (Docket Entry 1).

## II.  REVIEW OF THE RECORD

Plaintiff was born on October 8, 1971.  (Tr. 64).  She is married and lives with her husband, her two teenage daughters, and her three year-old son.  (Tr. 335).  Plaintiff has a twelfth grade education and has past work experience in cosmetology, retail, senior care, and as a teacher's aide.  (Tr. 28).  Plaintiff claims disability because she suffers from severe depression and mental disorders.  (Docket Entry 17).  She has not worked since the birth of her son in 2007.

A.     **Medical Record**

Plaintiff has received intermittent treatment for depression since 1999.  (Tr. 209).  On January 13, 1999, Plaintiff arrived at the Frist Clinic complaining of fatigue, lack of motivation, and depression.  *Id.*  Plaintiff was prescribed Zoloft and reported improvements during her next visit on February 26, 1999.  (Tr. 208-09).  Treatment notes reflect that Plaintiff remained stable through December 9, 1999.  (Tr. 205-09).

On August 31, 2000, Plaintiff reported recent stress, anxiety, and trouble sleeping.  (Tr. 204).  Treatment notes reflect that her depression was not well controlled and she was continued on Zoloft.  *Id.*  Plaintiff related on August 17, 2001 that her depression had improved, but she expressed concern about taking Zoloft because it caused her to gain weight.  (Tr. 203).  She received a prescription for Wellbutrin, but treatment notes from November 15, 2001 indicated that her condition had worsened.  (Tr. 202).  Plaintiff was prescribed Celexa along with the Wellbutrin.  *Id.*  Treatment notes indicate that Plaintiff received a prescription for Effexor on August 19, 2003, and doctors noted improved condition on September 30, 2003.  (Tr. 200-01).  Plaintiff complained of increased anxiety and depression on September 12, 2005, but treatment notes from October 24, 2005 reflect that her condition had improved.  (Tr. 197-98).  Plaintiff stopped taking her medications in February 2006 and did not visit the clinic during that year, but she reported depression and situational stress when she returned on January 31, 2007 and received a prescription for Celexa.  (Tr. 196).  Treatment notes from March 13, 2007 reflect that her depression had improved.  (Tr. 195).

On April 1, 2009, Plaintiff visited Dr. Tracy J. Osbourne at Middle Tennessee Internal Medicine.  (Tr. 237).  Dr. Osbourne noted that Plaintiff was not taking medication, and while she

could not tolerate short term Wellbutrin, she had responded well to Zoloft and Effexor in the past. *Id.* Plaintiff was diagnosed with depression and prescribed Effexor. (Tr. 237-38).

Plaintiff returned to see Dr. Osbourne on April 8, 2009, complaining that her condition had worsened. (Tr. 312). Dr. Osbourne's treatment notes reflect that Plaintiff was very emotional and had been unable to sleep or take care of her children. *Id.* Plaintiff also exhibited issues with anger management, and was tearful and upset during the visit. Dr. Osbourne noted that Plaintiff had not filled her prescription for Effexor due to cost. *Id.* An assessment of Plaintiff's condition indicated major depression, paranoid features, anger management issues, anxiety, and sleep disturbance. *Id.* Dr. Osbourne recommended hospitalization at Parthenon Pavilion for an intake evaluation, and Plaintiff and her husband agreed that she would go voluntarily. (Tr. 313).

Plaintiff was admitted to Parthenon Pavilion on April 8, 2009. (Tr. 245). She reported that her condition began to worsen in February when she stopped taking Celexa and Wellbutrin because she thought she could not afford them any longer. *Id.* Plaintiff also reported that she had been paranoid for about 6 weeks prior to hospitalization, and had experienced increased symptoms of depression, including middle insomnia, decreased energy, very poor concentration, and fluctuating appetite. *Id.* The treatment notes of Dr. Daniel J. Friedman reflect that Plaintiff hears voices in the distance. *Id.* Dr. Friedman noted that Plaintiff's speech was normal and her thoughts were generally goal-directed, but that her attention and memory were poor. (Tr. 246). Plaintiff's Global Assessment of Functioning (GAF) at the time of hospitalization was 23.[1] *Id.*

---

[1] The Global Assessment of Functioning test is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain personal hygiene, or serious suicidal act with clear expectation of death). A GAF of

On April 14, 2009, Plaintiff was discharged from Parthenon Pavilion after being diagnosed with major depression, severe, with psychotic features, and a GAF of 48.[2] (Tr. 240). The treatment notes reflect that Plaintiff stopped taking her antidepressant in December 2008, but restarted her medications in February 2009 due to decompensation. (Tr. 241). Plaintiff was placed on a variety of medications and her condition improved markedly during her hospitalization. (Tr. 243). By April 14, she no longer had psychotic symptoms and was discharged from care with prescriptions for Risperdal, Celexa, Trazodone, Ativan, and Isoniazid. *Id.*

Following her discharge, Plaintiff visited Centerstone Community Mental Health Center for periodic medication management and psychotherapy. (Tr. 243, 249). At her intake assessment on April 20, 2009, Plaintiff's mood and affect were appropriate, and notes reflect that she needs to stay on medication in order to continue to function and take care of her children. (Tr. 253). A progress note from April 24, 2009 indicates that Plaintiff was rude to the receptionist and claimed to need a psychiatric evaluation in place of counseling. (Tr. 255).

After filing for disability, Plaintiff completed a Function Report on May 10, 2009. (Tr. 144-51). Plaintiff reported that all day she cares for her son and two teenage girls, but one day she couldn't remember if she fed her son breakfast and had to ask her sister to help her care for her son. (Tr. 144). When Plaintiff has trouble sleeping she can't remember things, hears voices,

_____

21 to 30 indicates the presence of hallucinations or delusions which influence behavior, serious impairment in ability to communicate with others, serious impairment in judgment, or inability to function in almost all areas. *Edwards v. Barnhart*, 383 F.Supp.2d 920, 924 n. 1 (E.D. Mich. 2005); Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th Ed. 2000) ("DSM-IV-TR").

[2] A GAF of 41-50 falls within the range of "[s]erious symptoms . . . OR serious impairment in social, occupational, or school functioning . . ." DSM-IV-TR at 34.

and starts to become scared in her own house. (Tr. 145). Plaintiff also reported an ability to prepare meals for herself and her family. (Tr. 146). Moreover, Plaintiff related that she is able to clean, do laundry, iron, mow the lawn, load and unload the dishwasher, drive, shop for groceries, and play outside with her son. (Tr. 146-48). Plaintiff claimed that her condition specifically worsens when she does not take her medication. (Tr. 149).

On May 21, 2009, Plaintiff was examined at Centerstone by Dr. Yuejin Chen. (Tr. 257-61). Plaintiff denied hallucinations and reported that her mood had been stable, sleep had been good, and her paranoia had decreased. (Tr. 257). Treatment notes indicate that Plaintiff's GAF score was 50. (Tr. 260). Dr. Chen advised Plaintiff to decrease Risperdal and minimize her Lorazepam prescription, and continued Plaintiff on Celexa and Trazodone. (Tr. 261). During this visit, Plaintiff declined the option of psychotherapy. *Id.*

On June 18, 2009, Dr. Chen noted that Plaintiff's mood appeared stable and that Plaintiff reported her condition was improving. (Tr. 280). The treatment notes also reflect that Plaintiff's sleep and appetite were fair. *Id.* Dr. Chen increased the time between visits to once every two months. *Id.*

Plaintiff visited Dr. Osbourne on July 2, 2009 for a follow-up examination after her admission to Parthenon Pavilion. (Tr. 314). Dr. Osbourne noted that Plaintiff's condition had improved with her adjusted medications and that her insomnia was controlled. *Id.*

After Plaintiff filed for DIB, State Agency medical consultant G. Coffee evaluated Plaintiff's medical records. (Tr. 265-77). The psychiatric review technique indicates that while Plaintiff's evaluation was based on affective disorders and the medical consultant noted major depression with psychosis treated effectively, her impairments were not severe. (Tr. 265, 268). In rating Plaintiff's functional limitations, the medical consultant found that Plaintiff had mild

restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and one or two episodes of decompensation. (Tr. 275). Moreover, the medical evidence did not establish the presence of the "C" criteria in Listing 12.04. (Tr. 276). The medical consultant's notes reflect that as long as Plaintiff takes her medications she is capable of a full range of independent activities, and that her claims have reduced credibility because they pertain to her condition prior to recent treatment. (Tr. 277).

Plaintiff returned to Dr. Chen on August 12, 2009 and reported that except for crying once since her last visit, her mood was otherwise stable while taking her current medications. (Tr. 285). Dr. Chen noted that Plaintiff still needs to take Trazodone to help her sleep. *Id.*

As part of her request for reconsideration, Plaintiff completed another Function Report on September 21, 2009. Plaintiff reported that she was less active and had a hard time doing her daily chores and activities. (Tr. 168).

On January 4, 2010, Victor O'Bryan, Ph.D., a State Agency medical consultant, reviewed the available medical evidence and prepared a psychiatric review technique and a Mental Residual Functional Capacity (RFC) Assessment. (Tr. 293-309). Dr. O'Bryan assessed Plaintiff with a mild limitation in restriction of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and one or two episodes of decompensation, each of extended duration. (Tr. 303). He also indicated that the evidence did not establish the presence of the "C" criteria. (Tr. 304). Plaintiff's GAF at the time of evaluation was 50. (Tr. 305). Dr. O'Bryan noted that Plaintiff was not significantly limited in understanding and memory, social interaction, and adaptation. (Tr. 307-08). Additionally, Plaintiff was not significantly limited in sustained concentration and persistence,

except that she had a moderately limited ability to maintain attention and concentration for extended periods. (Tr. 307). The RFC Assessment also reflected that Plaintiff was moderately limited in the ability to complete a normal workday and work week without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 308). Dr. O'Bryan concluded that Plaitiff could do detailed work, interact appropriately in the workplace, adapt to normal changes in work routine, and maintain CPP for two-hour periods during the workday. (Tr. 309).

Dr. Osbourne examined Plaintiff on April 28, 2010 and determined that Plaintiff was taking her medications and that her anxiety and depression were well controlled. (Tr. 316-17). Plaintiff was to continue on her current medications, and Dr. Osbourne recommended that she improve her diet and exercise in order to help with her anger management. (Tr. 317). On January 12, 2011, Plaintiff returned to Dr. Osbourne for an annual physical. (Tr. 318). Dr. Osbourne's treatment notes reflect that Plaintiff was doing better while taking Wellbutrin and Celexa, and she recommended that Plaintiff continue on her current medications. *Id.*

Plaintiff was admitted to Skyline Hospital in Madison, Tennessee on May 2, 2011 after complaining of increased depression, paranoia, and insomnia. (Tr. 333). Dr. Chandra S. Krishnasastry conducted a psychiatric evaluation on May 3, 2011 and indicated that Plaintiff had started cutting down her dosage of Celexa, Wellbutrin, and Trazodone because she felt better. (Tr. 335). Plaintiff reported that after cutting down on her medication she became listless and had decreased energy, depressed mood, suicidal thoughts, and guilt feelings. *Id.* Plaintiff denied having any manic or psychotic symptoms. *Id.* She related that she recently increased her alcohol intake, but denied that it was a problem. *Id.* Dr. Krishnasastry noted that Plaintiff was alert and oriented to time, place, and location, but had a very flat affect, slow speech, and psychomotor

retardation. (Tr. 336). Plaintiff also exhibited poor concentration, adequate judgment, and partial

insight. *Id.* The recommended treatment plan included close monitoring and a continued

prescription for Wellbutrin and Trazodone. *Id.* Dr. Krishnasastry also indicated that he would

prescribe Cymbalta. *Id.* After treating Plaintiff with Wellbutrin, Effexor, Trazodone, and

Ambien for sleep, Dr. Krishnasastry noted that Plaintiff's mood was significantly better and that

her sleep had improved. (Tr. 331). Plaintiff was discharged from Skyline on May 7, 2011 and

referred to Centerstone Mental Health Center for intake on May 18, 2011. (Tr. 330-31). Dr.

Krishnasastry provided Plaintiff with detailed instructions regarding diet, activity, medication

managements, follow-up appointments, and an individual crisis plan in the event of an

emergency. *Id.*

### B. **Hearing Testimony**

As noted in the procedural history, Plaintiff testified before an ALJ on May 18, 2011.

(Tr. 20-50). Plaintiff testified that at the time of the hearing she was thirty-nine years old and had

a twelfth grade education. (Tr. 28). Since being hospitalized in 2009, Plaintiff has had a difficult

time sleeping, being completely unable to sleep about two or three nights a week, and is often

lethargic the day after as a result. (Tr. 29). She testified that during these lethargic periods she

has to call her mother and sister to care for her three year-old son. *Id.* Because Plaintiff has

trouble sleeping at night, she often has to sleep for two or three hours during the middle of the

day and calls her mother and sister for help during those times. *Id.*

Plaintiff followed up at Center Stone after her hospitalization, but the cost of treatment

was $70 per session and she didn't have the money or enough insurance to continue seeking

treatment there. (Tr. 30). She related that she was able to sustain employment from 1999

through her hospitalization in 2009, but she cried all the time while she worked. *Id.* Plaintiff

testified that her condition is worse than when she was working. (Tr. 31). She claimed that she can't function without her medicine, has sleep problems, and is unable to focus. *Id.* Due to her poor memory and need to sleep three times per week in the middle of the day, Plaintiff does not believe she could hold a job. *Id.*

Prior to her hospitalization in 2011, Plaintiff cut her medication dosage in half to save money, which caused her reduced focus, lack of concentration, and inability to care for her home. (Tr. 32). Plaintiff testified that she cut her pills in half solely to save money, not because she was feeling better. (Tr. 35). She also testified that she has not talked to her doctors about the side effects of sleeping during the day because at the time she believed she could handle it on her own. (Tr. 42-43). Her health insurance covers her prescriptions, but she has a $3,000 deductible and must pay for her medications herself, with Effexor costing $16 per month. (Tr. 35-36). Plaintiff's husband picked up her Trazodone prescription, so she does not know how much it costs. (Tr. 37). Plaintiff has not researched any programs that people can qualify for to get prescribed medication.[3] (Tr. 36).

At the time of hearing, Plaintiff was taking Effexor for her mental symptoms and Trazodone for sleeping. (Tr. 34). Plaintiff testified that she noticed a slight improvement in her ability to sleep after going on the medicine. *Id.* She generally wakes up by 8 a.m., takes her fourteen year-old daughter to middle school, and takes care of her three year-old son all day. (Tr.

---

[3] The ALJ indicated that he would allow Plaintiff until June 8, 2011, three weeks after the date of the hearing, to supplement the evidence on the administrative record. (Tr. 22-23). While the ALJ granted the extension to obtain the medical records from Plaintiff's May 2011 hospitalization, Plaintiff failed to produce any evidence with respect to her financial condition. Plaintiff also failed to show that she had made any effort following the hearing to locate a more affordable treatment option. Further, there is no indication that Plaintiff attempted to introduce any information regarding her finances along with her request for review of the ALJ's decision by the Appeals Council. (Tr. 100-03).

38-39). Occasionally, she will watch her son and a neighbor's child while they play at her house, and she is able to socialize with her next-door neighbor. (Tr. 39-40). Plaintiff testified that she is capable of shopping for groceries, but she often doesn't have the energy to prepare meals for her family. (Tr. 40-41). When taking her medicine she gets headaches that last for about an hour, but recovers when she takes medicine to combat the headaches. (Tr. 32). If she is not on her medication, Plaintiff generally sees and hears things. *Id.*

Plaintiff testified that before she cut back on her medicine, she still required help with her son about two or three times per week because she has always had trouble sleeping. (Tr. 41). She was also not consistent in preparing meals before decreasing her dosage. (Tr. 42). However, Plaintiff admitted that her condition worsened when she reduced her medication. (Tr. 41).

The Vocational Expert, Pedro Roman, testified that Plaintiff has past relevant work as a teacher's aide, home attendant, childcare attendant, sales clerk, and hairstylist. (Tr. 44). The ALJ asked Mr. Roman to consider an individual between 37 and 39 years old, with a high school education and past relevant work in the positions described. (Tr. 46). Such an individual that also had the ability to understand, remember, and carry out detailed tasks and instructions with adequate concentration, persistence, and pace, and that had the ability to adapt to normal changes in the workplace, could perform all of Plaintiff's past relevant work. *Id.* Mr. Roman testified that if the individual required unpredicted breaks of more than an hour two to three times per week due to side effects from medication that result in lethargic behavior requiring rest, such an individual could not perform any of Plaintiff's past relevant work, nor any other work in the local and/or national economy. (Tr. 46-47).

### III. PLAINTIFF'S STATEMENT OF ERRORS AND CONCLUSIONS OF LAW

Plaintiff's Motion does not clearly list the alleged errors. The Magistrate Judge believes

that the Commissioner's Response accurately reflects those errors identified by Plaintiff.  First, Plaintiff alleges that the ALJ improperly determined Plaintiff's condition was disabling without treatment but did not determine whether affordable treatment was available.  Second, Plaintiff argues that the ALJ erred in concluding Plaintiff's depression did not meet a listing level impairment.  Third, Plaintiff claims that the ALJ failed to adequate consider Plaintiff's GAF scores and recent medical records.

A.     Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process.  *See Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision.  *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion."  *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance."  *Bell v. Commissioner*, 105 F.3d 244, 245 (6th Cir. 1996).  Even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached.  *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  However, failing to consider the record as a whole undermines the commissioner's conclusion.  *See Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985).

B.     Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his

or her "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months."  42

U.S.C. § 423(d)(1)(A).  At the administrative level of review, the claimant's case is considered

under a five-step sequential evaluation process as follows:

1.	If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

2.	If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

3.	If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[4] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

4.	If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (*e.g.*, what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

5.	Once the claimant establishes a *prima facie* case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by providing the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

Even once the analysis has reached step five, it remains the burden of the claimant to prove

the extent of the disability.  *Her*, 203 F.3d at 391.  In determining residual functional capacity

(RFC) for purposes of the analysis required at steps four and five above, the Commissioner is

required to consider the combined effect of all the claimant's impairments, mental and physical,

exertional and nonexertional, severe and non-severe.  *See* 42 U.S.C. § 423(d)(2)(B).

---

[4] The Listing of Impairments is found at 20 C.F.R., pt. 404, Subpt. P, App. 1.

C.    <u>The ALJ Properly Evaluated Plaintiff's History of Noncompliance</u>

Plaintiff's principal argument is that the ALJ failed to appropriately evaluate whether her inability to afford medication was the reason for her lack of medical compliance and failure to follow prescribed treatment. Social Security regulations require a claimant to follow treatment prescribed by a physician if such treatment is able to restore the claimant's ability to work. 20 C.F.R. 404.1530(a) and 416.930(a). If the claimant does not follow the prescribed treatment and is not able to provide good reasons for failing to follow the prescribed treatment, then the claimant will not be found to be disabled. 20 C.F.R. 404.1530(b) and 416.930(b). Inability to afford prescribed treatment can serve as justification for failure to follow prescribed treatment, but only for individuals with *disabling impairments*. SSR 82-59, 1982 WL 31384. While the ALJ found that Plaintiff has major depressive disorder, a severe impairment, he opined that her condition was not disabling. (Tr. 12). Specifically, the ALJ noted that aside from two hospitalizations arising from failure to take her medication, Plaintiff's condition has been stable. (Tr. 15). She has been able to take her teenage daughters to school, care for her three year-old son, cook, clean, do laundry, mow the lawn, shop, and visit her mother and her friends. (Tr. 144-49). Doctors have noted that Plaintiff's depression and ability to sleep improve when she takes her prescribed medication, and no physician she visited has opined that Plaintiff's condition is disabling or that she is unable to work. (Tr. 15). Accordingly, there is substantial evidence to support the ALJ's conclusion that Plaintiff's impairment is not disabling.

Even if the ALJ found Plaintiff had a disabling impairment in the absence of treatment, Plaintiff did not provide good reasons for her failure to follow treatment because she failed to demonstrate an inability to afford her medication. The Magistrate Judge believes Defendant's argument that the record reflects Plaintiff had the ability to afford medical treatment is well taken.

Plaintiff testified that she cannot afford her Effexor, which costs $16 per month, and Trazodone, which she does not know the price of. (Tr. 36-37). However, the record shows that over the past several years Plaintiff has been able to afford other types of medical treatment, including regular gynecological exams, mammograms in 2008 and 2009, a colonoscopy in 2010, latent tuberculosis infection therapy, and birth control and diabetes medication. (Tr. 221, 237, 310, 312, 314, 316, 318). Moreover, to properly demonstrate an inability to afford medical treatment, all possible resources, including clinics and charitable and public assistance agencies, must be explored, and the claimant's financial circumstances must be documented. SSR 82-59, 1982 WL 31384. Plaintiff testified that she did not explore any of these options before claiming disability, nor has she provided any documentation regarding her current financial circumstances. (Tr. 36).

Plaintiff primarily relied on the Sixth Circuit decision *McKnight v. Sullivan* in asserting that the ALJ failed to consider Plaintiff's financial circumstances. However, there are important factual differences between the court's decision in *McKnight* and the Plaintiff's circumstances. The district court in *McKnight* found that Plaintiff did not have a severe impairment at Step 2 of the disability analysis because the condition was remediable by surgery, so for their purposes there was no reason to determine whether the impairment was disabling in the absence of treatment. *McKnight v. Sullivan*, 927 F.2d 241, 242 (6th Cir. 1990). Here, the ALJ found that Plaintiff was not disabled at Step 4 of the disability analysis, and, as noted above, his determination that Plaintiff had not been under a disabling condition at any point was supported by substantial evidence. Moreover, the treatment at issue in *McKnight* was a surgical procedure to correct the plaintiff's glaucoma, which is a much more expensive option than refilling a prescription that costs $16 per month. Thus, the Plaintiff's reliance on *McKnight* is misplaced.

The ALJ also appeared to evaluate Plaintiff's credibility in connection with her history of

15

noncompliance. Specifically, the ALJ noted the medical records reflect that prior to her hospitalizations Plaintiff decreased her medications because she was feeling better, but then contradicted those assertions in her hearing testimony by claiming that she cut her pills in half to save money. (Tr. 15). An individual's statements may be less credible if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure. SSR 96-7p, 1996 WL 374186. As noted above, because Plaintiff failed to exhaust her clinical opportunities or produce any supporting evidence of financial troubles, her assertion that she could not afford medications was correctly afforded less weight. Moreover, Plaintiff's claims of poverty are entitled to less credibility because she provided that explanation after reporting during her hospitalization that she decreased her medication dosage on her own because she was feeling better. Here, the record indicates that taking her medication as prescribed controlled and improved Plaintiff's symptoms, and that failure to follow prescribed treatment resulted in both hospitalizations. The record also supports the conclusion that Plaintiff did not have a disabling condition at any point during her treatment, that she failed to demonstrate her inability to afford medication, and that her statements of financial poverty lack credibility. Accordingly, the ALJ did not err in his evaluation of Plaintiff's history of noncompliance.

D.    <u>The ALJ Properly Concluded Plaintiff's Impairment Did Not Meet or Equal a Listing</u>

Plaintiff contends that the ALJ failed to consider whether she meets the disability requirements set forth in Listing 12.00 of the Listing of Impairments. This listing contains three paragraphs which detail the criteria for evaluating disability on the basis of mental disorders. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00. Paragraph A pertains to the presence of a particular mental disorder and describes certain signs, symptoms, and laboratory findings that are necessary to substantiate the presence of a particular mental disorder. *Id.* at § 12.00(A). Paragraphs B and C

describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity. *Id.*

Plaintiff presumably argues that she is disabled under Listing 12.04 (Affective Disorders). To meet or equal the criteria of this listing, a claimant's impairment(s) must meet either both the "A" and "B" criteria, or the "C" criteria. *Id.* at §§ 12.00, 12.04. The "B" criteria for this listing require the mental disorder to result in at least two of the following: (1) marked restriction in activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation, each of extended duration. *Id.* at § 12.04. To meet the "C" criteria, Plaintiff must have a documented history of a chronic affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: (1) repeated episodes of decompensation, each of extended duration; or (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in environment would be predicted to cause the individual to decompensate; or (3) current history of one or more years inability to function outside a highly supportive living environment, with an indication of continued need for such an arrangement. *Id.*

The ALJ assessed Plaintiff with (1) mild impairment in the activities of daily living, (2) mild limitation in social function, (3) moderate limitation in her ability to maintain concentration, persistence, or pace, and (4) 1-2 episode of decompensation of extended duration. (Tr. 12). Here, the record contains substantial evidence to support the ALJ's assessment. As detailed above, Plaintiff reported that she can take her teenage daughters to school, care for her three year-old son, cook, clean, do laundry, mow the lawn, shop, and visit her mother and her friends. (Tr. 144-49).

Regarding social functioning, Plaintiff testified at her hearing that she has friends, and occasionally socializes with a next-door neighbor. (Tr. 39-40). With respect to her moderately limited ability to maintain concentration, persistence, or pace, the record reflects that Plaintiff is able to get her teenage daughters ready for school and care for her three year-old son during the day. (Tr. 38-39). Moreover, the ALJ's evaluation of Plaintiff's mental residual functional capacity matches the evaluation conducted by Dr. O'Bryan in January 2010, and the ALJ placed greater limits on Plaintiff's ability to maintain concentration, persistence, or pace than the evaluation performed by G. Coffee in July 2009. (Tr. 12, 265-77, 293-309).

Further, the record supports the ALJ's determination that Plaintiff only experienced 1-2 episodes of decompensation of extended duration. To qualify as an episode of decompensation, there must be exacerbation or temporary increase in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00(C)(4). The term "repeated episodes of decompensation, each of extended duration," means three episodes within one year, or an average of once every four months, each lasting for at least two weeks. *Id.* Here, Ms. Clark was hospitalized for six days in April 2009 and five days in May 2011, but the record does not indicate any other significant period of decompensation. After each hospitalization, Plaintiff exhibited improvements in her condition when taking her prescribed medication properly. Treatment notes from June, July, and August 2009 reflect that Plaintiff's condition was stable and improving. (Tr. 280, 285, 314). Plaintiff also testified that her depression and sleeping problems improve when she takes her medication as prescribed. (Tr. 34, 41). The ALJ's determination regarding Plaintiff's episodes of decompensation comports with the evaluations completed by the State Agency medical

consultants in July 2009 and January 2010. (Tr. 275, 303). Thus, the ALJ properly concluded that Plaintiff did not meet the "B" criteria.

The ALJ also determined that Plaintiff did not meet the "C" criteria. (Tr. 12). Both medical consultants that evaluated Plaintiff determined that the evidence surrounding Plaintiff's condition did not establish the presence of the "C" criteria. (Tr. 276, 304). As noted above, she has not suffered repeated episodes of decompensation as a result of her condition. Despite battling depression for the past 13 years, there is no evidence that Plaintiff's condition limits her ability to do work-related activities. She is able to care for her children and her home, cook, clean, do laundry, and drive. Although Plaintiff has reported feelings of paranoia and distress, evaluators and physicians have also consistently noted that Plaintiff's condition improves significantly when she is treated with a combination of prescribed medications. Specifically, the evaluation conducted in July 2009 indicated that when Plaintiff takes her medicine she is capable of a full range of independent activities. (Tr. 265-77). Accordingly, because Plaintiff does not meet the "B" criteria or the "C" criteria, the ALJ's decision that Plaintiff's impairment did not meet the requirements set forth in Listing 12.00 is supported by substantial evidence.

E.      The ALJ Properly Evaluated the Available Medical Evidence

Plaintiff argues that the ALJ failed to properly consider Plaintiff's May 2011 hospitalization and low GAF scores in denying her application for disability. With respect to the May 2011 hospitalization, Plaintiff reported on intake that she cut down her own medication because she was feeling better and that after doing so she became restless and had decreased energy, depressed mood, and guilt feelings. (Tr. 335). However, her condition improved significantly when Dr. Krishnasastry placed her on a series of different medications and monitored her treatment. (Tr. 330-33). Plaintiff also testified that her depression and ability to sleep improve

when she takes her medications. (Tr. 34). Aside from the May 2011 hospitalization, which resulted because she did not take her medications as prescribed, treatment notes reflect that Plaintiff's condition had stabilized and improved since her hospitalization in April 2009.

Regarding her GAF scores, Plaintiff argument appears to be that because she had a GAF of 48 following her discharge from the hospital in April 2009, and a GAF of 30 after discharge on May 7, 2011, the ALJ should have found her disabled. However, GAF scores are not determinative of disability. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 503 n. 7 (6th Cir. 2006). In *Kornecky*, the court indicated that while a GAF score may help an ALJ assess mental RFC, it is not raw medical data. *Id.* Rather, it assists a mental health professional in evaluating medical signs and symptoms to form a general assessment of the patient's mental condition, so that it can be understood by a lay person. *Id.* The court held that even a GAF as low as [40-50] may not disturb the determination made by the ALJ if other substantial evidence (such as the extent of the claimant's daily activities) supports finding the claimant not disabled. *Id.* at 511. Even though doctors assessed Plaintiff with a low GAF score on separate occasions, there is substantial evidence to support the ALJ's denial of disability. As noted above, Plaintiff's condition began to improve after her hospitalization in April 2009, and her condition appeared to stabilize for the next two years. Only when she began decreasing her medication did she experience the increased symptoms of depression, anxiety, and stress that led to her most recent hospitalization. Once she began a new program of medications, her condition began to stabilize and improve. Moreover, as detailed numerous times above, when she takes her medication Plaintiff has the ability to complete several activities during the course of the day, most notably being able to care for her three year-old son. Because the ALJ properly evaluated the effects of Plaintiff's May 2011 hospitalization and did not err in discounting her low GAF scores, the ALJ

properly evaluated the available medical evidence.

## IV.  RECOMMENDATION

In light of the foregoing, the Magistrate Judge **RECOMMENDS** that Plaintiff's Motion be **DENIED** and the action be **DISMISSED**.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objection to it with the District Court.  Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004) (en banc).

ENTERED this 2nd  day of August, 2012.


/S/ Joe B. Brown
JOE B. BROWN
United States Magistrate Judge